UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JEAN KURIAKOSE,

        Plaintiff,                Case No. 14-12972

v.                               Paul D. Borman
                               United States District Judge

VETERANS AFFAIRS ANN         Mona K. Majzoub
ARBOR HEALTHCARE SYSTEM,    United States Magistrate Judge

        Defendant.
_____/

## OPINION AND ORDER
## (1) GRANTING DEFENDANT'S MOTION
## FOR SUMMARY JUDGMENT (ECF NO. 39),
## (2) DENYING AS MOOT DEFENDANT'S MOTION TO EXCLUDE
## EXPERT TESTIMONY (ECF NO. 30)

This action involves Plaintiff's claim that her employer, the Defendant Veterans

Affairs Ann Arbor Healthcare System (the "VA"), through its agents and particularly

through the acts of Plaintiff's co-worker, Dr. Wessam Bou-Assaly, created and

permitted to exist a hostile work environment in which Plaintiff was subject to sexual

harassment and retaliated against when she complained about the harassment she

alleges she endured.

Defendant now moves for summary judgment, limited to the issue of whether

1

Plaintiff failed to properly exhaust her administrative remedies, which required that she (1) timely contact an EEO Counselor regarding her claim and (2) timely file a formal Equal Employment Opportunity (EEO) Complaint with the VA, two independent statutory prerequisites to filing her Title VII claim against the VA.[1] Defendant also seeks to exclude the opinion of Plaintiff's medical expert, Dr. Gerald Shiener. For the reasons that follow, the Court GRANTS Defendant's Motion for Summary Judgment and DENIES AS MOOT Defendant's Motion to Exclude Dr. Shiener's opinions.

## I. BACKGROUND

### A. Plaintiff's Position at the VA and Her Allegations of Harassment by Bou-Assaly

Plaintiff was born in India and is a United States citizen. (ECF No. 40, Pl.'s

---

[1] On May 21, 2015, this Court entered an Order granting Defendant's motion to dismiss based on Plaintiff's failure to timely exhaust her claims. (ECF No. 10, Order Granting Defendant's Motion to Dismiss.) In connection with the motion to dismiss, both parties submitted and relied on numerous exhibits and other evidence well outside the pleadings and the Court converted the motion to one for summary judgment pursuant to Fed. R. Civ. P. 12(d). The Court found that Plaintiff failed to properly exhaust administrative remedies and granted judgment in favor of Defendant. Plaintiff filed a motion for reconsideration, arguing that she was prejudiced by the conversion and requesting the opportunity to conduct discovery limited to the issue of exhaustion. (ECF No. 12, Motion for Reconsideration.) The Court granted the motion, vacated its Order and Judgment of dismissal, and permitted the parties to engage in discovery limited to the issue of exhaustion and permitting a new dispositive motion to be filed on the issue of exhaustion following that limited discovery. (ECF No. 17, Order Granting Motion for Reconsideration.) Defendant now files its renewed dispositive motion on the issue of exhaustion under Fed. R. Civ. P. 56.

Resp. Ex. A, February 18, 2016 Deposition of Jean Kuriakose, M.D. 11:16-19.) Plaintiff attended medical school in India, graduated in 1999, did her radiology residency in the United Kingdom, and completed a fellowship in cardiothoracic radiology at the University of Michigan ("UM") in 2009. (*Id*. at 13:17-15:9.) Plaintiff began working for the VA in Ann Arbor in 2010 as a staff physician in cardiothoracic radiology interpreting images, including x-rays, MRIs, CT Scans, ultrasounds, principally of the chest area. (*Id*. at 16:25-17:24.) Plaintiff's job involved identifying many different life threatening conditions such as cancer, heart disease, and collapsed lung. (*Id*. at 19:15-20:14.)

In 2013 through 2014 , Plaintiff was employed part time at the VA (7/8) and part time at UM (1/8) and her typical "tour of duty" (working hours) at the VA was Tuesday, Wednesday, Thursday 8:00 a.m. - 4:30 p.m. Plaintiff worked at UM once every two weeks and her duties were the same at both the VA and UM. (*Id*. at 20:22-22:6, 23:13-21.) During 2013 and through the date of her departure from the VA in December, 2014, the time period relevant to this case, Plaintiff's direct supervisor at the VA was Dr. Venkat Krishnamurthy. Dr. Krishnamurthy's direct supervisor was Eric Young, the Chief of Staff of Radiology. Plaintiff's supervisor at UM was Ella Kazerooni and Dr. Kazerooni's supervisor at UM was Reed Dunnick. (*Id*. at 22:7-15, 23:22-24:6.)

Plaintiff first met Bou-Assaly, who was a staff radiologist at the VA and was also an assistant professor of radiology at UM, when she started working for the VA in 2010. He was a colleague and Plaintiff did not socialize with him, although she did meet his wife once and found her to be "a very nice lady." (*Id.* at 42:2-43:3; Compl. ¶ 12.) According to Plaintiff, Bou-Assaly began to harass her toward the end of 2011 and into 2012. The harassment began just verbally, with Bou-Assaly using "the wrong tone," but quickly progressed to his use of profane words and sometime in 2012 he began describing sexual acts and making explicit sexual comments about Plaintiff and other co-workers. (*Id.* at 43:4-44:8.) The harassment by Bou-Assaly progressed to touching in early 2012. Plaintiff describes incidents such as Bou-Assaly touching her neck and then moving his hand down her back and touching her bra strap. (*Id.* at 44:8-45:20.)

In early 2012, Plaintiff reported his sexually profane language and unwanted touching to her supervisor at the VA Dr. Krishnamurthy. Plaintiff reports that Dr. Krishnamurthy asked her if she was just "sensitive," but he never followed up with her. Plaintiff suspects that Dr. Krishnamurthy did talk to Bou-Assaly about her complaint because Bou-Assaly began saying things to her, like "why are you speaking to pink nipples," which made her think that Dr. Krishnamurthy had told Bou-Assaly what she said and that Bou-Assaly was "jealous." Plaintiff complained to Dr.

Krishnamurthy several times in 2012 but he took no action and he ultimately called her "a complainer." (*Id*. at 45:22-47:14, 48:12-22.) Plaintiff testifies that Bou-Assaly was treating a lot of women this way, to the point that people would hide from him "in the stairwells and under desks" – it was "horrendous." (*Id*. at 47:15-48:11.)

Plaintiff states that on December 6, 2013, Bou-Assaly unzipped his pants and exposed his genitals to Plaintiff and grabbed her breast – very hard. (*Id*. at 50:3-10.) It happened around 4:00 p.m. on Friday at the VA in the radiology reading room. Plaintiff characterized the touching as an assault and she hid in the toilet until Bou-Assaly left and then immediately went looking for her supervisor, Dr. Krishnamurthy, in the IR (interventional radiology) room. Dr. Krishnamurthy wasn't there and did not respond to a page. Plaintiff had radiology reports to finish and paperwork to complete, but she was afraid to return to the room where she worked for fear Bou-Assaly would assault her again. She told a Nurse Practitioner (whose name she can't recall) what had happened and asked her to stand watch at the door while Plaintiff finished her paperwork. Plaintiff was told by Kim Beers that Dr. Krishnamurthy had left for the day but she did not tell Ms. Beers what had happened to her. (*Id*. at 50:14-53:1.) Plaintiff was "frozen" and just wanted to get out of the VA. She did not think to call the police. She went home and called her sister who lives in Florida to tell her what had happened and also told her husband. They agreed that something had to be

done but Plaintiff felt she had to "go up the chain of command" and tell Dr. Krishnamurthy first. (*Id.* at 53:8-54:25.)

Plaintiff went to work on Monday, December 9, 2013, and told her colleague, Dr. Perry Pernicano, the details of what had occurred on Friday afternoon with Bou-Assaly. Plaintiff believes that Dr. Pernicano must have known something of Bou-Assaly's conduct because there were multiple people who were very distraught about his conduct toward women generally. (*Id.* at 55:3-56:7.)

Between that Monday, December 9, 2013, and Christmas, Plaintiff kept trying to get some time to speak with Dr. Krishnamurthy. She told him several times that she had something serious to discuss with him, but she did not want to go into the graphic details in a corridor, so she never relayed to him the details of what had occurred on Friday, December 6, 2013. Dr. Krishnamurthy never followed up with Plaintiff to learn of the nature of the "serious matter" she had conveyed to him. Plaintiff states that she called human resources but no one answered the phone and she never left a message. She tried to contact several supervisors but people "were on vacation" and she could not make contact with anyone. So she continued reporting to work, and Bou-Assaly kept "pestering" her with text page messages, saying he needed to talk to her. (*Id.* at 57:19-61:7.)

On December 27, 2013, Plaintiff accessed the VA's online training program to

review the module on workplace sexual harassment. The training logs reveal that Plaintiff took the initiative and visited the training module on Prevention of Workplace Harassment/No Fear. Plaintiff stated that she wanted to determine who she should contact to complain about the incident. Plaintiff acknowledged that the training materials gave several options and also directed an aggrieved employee to contact an Equal Employment Opportunity ("EEO") counselor to file a complaint within 45 days of the incident. Plaintiff acknowledged that the training materials gave a phone number to call to contact an EEO counselor, but Plaintiff testified that she did not call that number, because she wanted a contact number that would allow her to call a specific person. She thinks she wrote down the number of the EEO but she can't recall. (*Id*. at 65:22-68:24.) Plaintiff understood the harassment training materials she reviewed to require that she talk to her supervisor before making an EEO complaint. (*Id*. at 69:9-18.)

The VA's workplace harassment training program materials that Plaintiff reviewed: (1) describe what constitutes sexual harassment under Title VII; (2) encourage employees experiencing harassment to report the conduct to a supervisor *or* to contact an EEO counselor at the Agency's Office of Resolution Management ("ORM"); (3) explain that contact with an EEO counselor must be initiated within 45 days of the incident complained of; and (4) contain a link to the ORM website that

provides step-by-step instructions for contacting ORM and initiating an informal EEO complaint. (Def.'s Mot. Ex. 6, "Prevention of Workplace Harassment/NO FEAR," PgID 1441, 1443, 1446.) The ORM is an independent branch of the VA and has no offices at the Ann Arbor VA. (Def.'s Mot. Ex. 7, March 9, 2016 Deposition of Diana Cass 12:23-25, 13:21-23.)

Finally, Plaintiff decided to try to report the incident to someone at UM and she arranged to meet with Ella Kazerooni, her supervisor at UM, on January 10, 2014. Plaintiff's VA colleague, Dr. Pernicano, went with Plaintiff to speak to Dr. Kazerooni. (Kuriakose Dep. 61:8-62:1.) Dr. Kazerooni acknowledged that this was very serious and she said she would contact all of the relevant people, including at the VA and UM, and assured Plaintiff that she was going to initiate the process for reporting the assault and suggested that Plaintiff go back to work. (*Id*. at 62:2-12.) Dr. Kazerooni did report the incident to the appropriate individuals at the VA, who referred the matter to the VA police at the VA hospital in Ann Arbor on January 10, 2014. (Cass Dep. 20:10-21, 22:7-23:25, 25:4-26:8.)

That same day, January 10, 2014, Plaintiff filed a complaint with the VA police stating that on December 6, 2013, Bou-Assaly sexually assaulted her in the radiology reading room – specifically that he unzipped himself, exposed himself and said "Look at me you idiot," and grabbed her breast very hard. (*Id*. at 62:13-64:14.) The VA

8

police asked her why she waited a month to report it and she said she was not sure why, but told the VA that her "supervisor" was on leave and she was waiting for *her* return – Plaintiff explained that she was referring to Dr. Kazerooni at UM, not Dr. Krishnamurthy from the VA. (*Id*. at 64:15-65:8.) Plaintiff also met with the Provost of UM, Anthony Wallesby, the Monday after the weekend of January 10, 2014, and discussed the matter with him. (*Id*. at 77:2-78:1.) Plaintiff continued to report to work following the incident on December 6, 2013, and through April 30, 2014, but it was hard for her. (*Id*. at 180:25-181:10.) She decided to utilize the UM Employee Assistance Program ("EAS"), which offered general counseling, not employment counseling. She met with a UM EAS counselor on January 16, 2014, and explained what had occurred and the harassment that followed. (*Id*. at 86:24-87:21, 91:1-10.) Her VA supervisor, Dr. Krishnamurthy, questioned why Plaintiff was going to UM EAS; Plaintiff considered his questioning her on this point to be harassment. (*Id*. at 90:2-17.)

### B.    Plaintiff's Interactions With the VA's EEO Office and the ORM

On January 10, 2014, Plaintiff received a page from Diana Cass, who identified herself as the EEO manager at the VA. Cass had learned of Plaintiff's complaints that day via Dr. Kazerooni through Dr. East, the acting chief of staff at the VA. (Cass Dep. 22:17-24). Cass spoke that day with Dr. Krishnamurthy and Dr. East about

Plaintiff's complaint and paged Plaintiff to arrange escorting Plaintiff down to Chad Dermyer at the VA Police to make a report. (Cass Dep. 64:19-66:4.) Cass stated in her page to Plaintiff that she would like to speak to Plaintiff about "some concerns that had been brought to her attention." Cass gave a telephone extension and asked Plaintiff to call back. Cass called Plaintiff again a couple hours later and again asked Plaintiff to call her back. (Kuriakose Dep. 70:3-15.) Subsequently, Cass did speak with Plaintiff and arranged to meet Plaintiff to escort her to the VA Police. (Cass Dep. 65:3-66:4.) Cass met Plaintiff and then introduced her to Officer Dermyer to make her report. Because the issue was a sexual assault, Cass did not stay for the interview with Dermyer; it was not appropriate for Cass to be involved in the police investigation. (Cass Dep. 67:21-68:12.) Plaintiff thought she recalled calling Cass back on January 10th and recalled having seen Cass briefly that day when she made the report to the VA police. (Kuriakose Dep. at 71:25-73:24, 76:16-22.)

Bou-Assaly also was interviewed by the VA police on January 10, 2014, and was placed on administrative leave on January 10, 2014, pending an investigation of alleged sexual assault. (Def.'s Mot. Ex. 9, Admin. Leave Memorandum PgID 1468; Kuriakose Dep. 78:13-79:25.) As part of their investigation of Plaintiff's complaint, the VA Police interviewed several employees in the radiology department, many of whom reported sexually harassing conduct by Bou-Assaly. (Pl.'s Resp. Ex. C, VA

Police Investigative Report, PgID 1698-1707.)

Bou-Assaly was criminally prosecuted by Washtenaw County and pled *no lo contendre* to criminal sexual conduct - Fourth Degree - on February 19, 2014. (Def.'s Mot. Ex. 10, Criminal Docket PgID 1469.) Plaintiff testified that she attended two or three of his criminal proceedings and she provided a victim impact statement. (Kuriakose Dep. 80:1-13.) Bou-Assaly never returned to the VA. (Kuriakose Dep. 78:13-79:25.)

After her report to the VA Police on January 10, 2014, Plaintiff did not make any further attempt to contact the EEO office until February 18, 2014, when Plaintiff emailed Diana Cass. (Cass Dep. 68:24-69:6.) She arranged to meet Cass the next morning in Cass's office. (Cass Dep. 70:12-72:7.) Despite the fact that Plaintiff had only had a brief interaction with Cass on January 10, 2014, when Cass escorted Plaintiff to the VA Police to file her report, Plaintiff explained that she did not contact Cass (or anyone at EEO) sooner because she was under the impression that Cass "knew what was going on" and "was handling things" and would get back to Plaintiff. (Kuriakose Dep. at 75:24-76:21.) Plaintiff believes that she told Cass on January 10, when they met briefly at the VA police office, that she wanted to file an EEO complaint. Plaintiff can't remember if she used those exact words but she assumed that Cass was working on preparing the EEO complaint. Plaintiff acknowledges that

she did not try to get in contact again with Cass until February 18, 2014, when she sent her an email asking to meet.  (*Id*. at 91:11-94:16.)

On February 19, 2014, Plaintiff met with Cass in Cass's office and told her she wanted to file an EEO complaint. At the February 19, 2014, meeting with Cass, Plaintiff explained in great detail all that had occurred and Cass took notes.  Plaintiff kept asking "is there paperwork I should sign," because she thought Cass was preparing an EEO Complaint.  But Cass said "I'll take care of it. I'll give it to you." All along Plaintiff thought she was dealing with an EEO officer and that Cass was preparing an EEO Complaint.  (*Id*. at 94:15-95:19.) Plaintiff requested a second meeting with Cass on February 25, 2014.

At a February 26, 2014 meeting with Cass, Plaintiff still believed that Cass was preparing her EEO Complaint. Cass recalls that Plaintiff handed her a list of complaints about Dr. Krishnamurthy, inappropriate questions Plaintiff believed Dr. Krishnamurthy was asking her, and a complaint about a reassignment of her workstation that Plaintiff felt was unfair.  (Cass Dep. 75:12-77:5.)  Cass could not recall specifically what was discussed regarding the EEO complaint process but Cass does not handle the processing of EEO complaints and she would have given Plaintiff a copy of the brochure that sits on her desk that maps out the process to be followed to file an EEO complaint, a process that must be initiated with a call ORM. Cass

would have explained that Plaintiff could not file an EEO complaint with Cass. (Cass Dep. 77:6-78:15.) Cass does not recall asking Plaintiff about the basis of her complaint because that is "personal" and something that would be set forth by the employee through the EEO complaint process. (Cass Dep. 78:16-80:7.) Cass explained that her only role is to provide employees with the EEO brochure – she does not take EEO complaints. The process clearly requires employees to call ORM to initiate the process. (Cass Dep. 80:8-81:1.)

Plaintiff first spoke with an attorney, a family friend, Harsha Gowda, in February 2014 about her claims. Gowda recommended that Plaintiff contact the Rasor law firm. (Kuriakose Dep. at 80:14-81:17.) Plaintiff testified that she spoke with Gowda after her report to the VA police on January 10, 2014, but she could not recall if she spoke to Gowda before or after she emailed Cass on February 18, 2014. (*Id*. at 82:10-84:2.) Plaintiff recalled that at the time of her meeting with Cass on February 26, 2014, she had spoken with attorney Gowda because she remembers telling him she was going to meet with the compliance officer. (*Id*. at 97:11-98:7.) Sometime around February 26, 2014, the VA attempted to change Plaintiff's tour-of-duty hours and her workstation. Plaintiff did not want to move her workstation and was afraid that the new hours would require her to be on duty after 4:30 p.m. when everyone had left for the day. After Plaintiff complained, her hours were restored to their original

times. Plaintiff concedes that her hours were never actually changed and her workstation was never moved. (*Id.* at 107:11-108:13.)

On February 26, 2014, Plaintiff asked to meet with the VA's Chief of Radiology, Eric Young. Plaintiff asked Ozzie James, the union president at the VA in Ann Arbor, to accompany her to the meeting with Young. Plaintiff was not a member of the union. (*Id.* at 111:6-114:22.) Plaintiff states that at the meeting with Dr. Eric Young she told him everything about Bou-Assaly, about Dr. Krishnamurthy's reaction, and about the history of Bou-Assaly's conduct. This was the first time she had brought any of this to Eric Young's attention. Young took notes and said he would follow up. (*Id.* at 113:19-114:19.) Young memorialized the meeting in a memorandum dated March 5, 2014, in which Dr. Young acknowledged the "inappropriate and abusive incidents" that Plaintiff had endured and praised her for coming forward with the information about Bou-Assaly earlier that year, which led to Bou-Assaly's immediate suspension and ultimate termination. (Def.'s Mot. Ex 12, March 5, 2014 Memorandum from Young to Kuriakose; Kuriakose Dep. 114:23-115:20.)

Following the meeting with Young, Ozzie James gave Plaintiff the number of ORM and told Plaintiff to contact the ORM. Plaintiff kept telling Ozzie that Diana Cass had her complaints but he told her to call this number and see if things had been

filed correctly. (Kuriakose Dep. 117:2-118:20.) Plaintiff recognized the number Mr. James gave her as the number she had taken down from the workplace training she had accessed on December 27, 2013. (*Id*. at 135:4-11.)

Plaintiff called the ORM on March 3, 2014. (*Id*. at 117:2-8.) The intake clerk who answered the phone told Plaintiff that there was no "category" for her allegations about retaliation for a sexual assault by Bou-Assaly that happened over a year ago. The intake clerk interpreted that Plaintiff was complaining about her recent change of work station and change of duty hours, and that Plaintiff felt these changes were made in retaliation for her complaints about Bou-Assaly. (*Id*. at 118:17-121:10.) The intake clerk at the ORM eventually listed Plaintiff's "reason for contact" as "Claim:Duty Hours," "Basis: Sex - Female," and "Date of Incident - 2/21/14." (Def.'s Mot. Ex. 13, ORM Initial Contact and Interview Sheet.) The Form also noted under "additional information/documents that should be reviewed," that "the AP [Aggrieved Party] stated she was sexually assaulted last year by a co-worker who was fired . . . [and] that she has been subjected to harassment the latest issue coming in the form of a Tour of Duty change." (*Id*. at 2, PgID 1478.) Plaintiff agreed that the Claim that was written up following her phone call "got the gist" of what Plaintiff had said but did not provide all of the detail. (*Id*. at 120:20-122:10.)

On March 4, 2014, the day after Plaintiff called the ORM to report her claim,

Plaintiff was sent an email by Lydia Ward, the EEO counselor, based in Cleveland, who was assigned to address the claim that Plaintiff called in on March 3, 2014. (Def.'s Mot. Ex. 18, 3/4/14 Email from Ward to Kuriakose.) Also, on March 4, 2014, Plaintiff retained attorney Jonathan Marko of the Rasor Law Firm, to advise her on the administrative process and her employment discrimination claim. (*Id*. at 122:20-123:6; Def.'s Mot. Ex. 14, Retainer Agreement.)

Plaintiff attended a mandatory EEO training session on March 5, 2014, that was being run by the EEO manager, Diana Cass, with whom Plaintiff had first spoken on January 10, 2014. (Def.'s Mot. Ex. 19, EEO Sign In Sheet.) Plaintiff can't remember if she picked up any of the informational brochures being distributed at the session but she recalls that Diana Cass announced at that training session that Cass was the person to contact if you are experiencing sexual harassment, so Plaintiff assumed that Cass had Plaintiff's EEO complaint "in hand," and felt "falsely reassured" at this meeting that Cass had already filed Plaintiff's EEO complaint. Plaintiff did not speak to Cass at this meeting. (Kuriakose Dep. 127:4-132:2.) At the mandatory training session, pamphlets describing the multi-stage EEO process, including a flow chart with explicit instructions on how to file informal and formal complaints, and the deadlines applicable to those complaints (45 days and 15 days respectively), along with phone numbers to contact the ORM, were distributed to the trainees. (Def.'s Mot. Ex. 8,

EEO Pamphlet; Cass Dep. 42:5-43:24.)  The Pamphlet is also posted in at least 25 locations throughout the VA Ann Arbor facility and is available on the VA's intranet site for employees.  (Cass Dep. 42:5-43:24.)  Plaintiff recalls that this Pamphlet, entitled "EEO Discrimination Complaint Process," was being handed out at the training session.  Despite the fact that she was in the midst of trying to file an EEO complaint, she does not remember going over the Pamphlet even though she was "still confused."  (Kuriakose Dep. 132:6-135:19.)

On March 6, 2014, Plaintiff received a package from Lydia Ward explaining, as Ward had done in her March 4, 2014 email, that Ward was Plaintiff's EEO counselor for her complaints reported to the ORM on March 3, 2014. (Def.'s Mot. Ex. 21, March 5, 2014 Letter With Enclosures from Ward to Kuriakose.) The paperwork indicated Plaintiff should advise Ward within 5 days if the material was incorrect in any way and that Plaintiff should sign and date the material and return copies of the forms to Ward. (*Id*. at PgID 1544.) The material contained a Notice of Rights and Responsibilities that again explained that the EEO process begins when the employee is contacted by an EEO counselor and that 30 days following that contact, the employee will have the right to further pursue the claim if not satisfied with the informal process by filing a formal complaint **within 15 calendar days** of receiving a Notice of Right to File a Discrimination Complaint.  (*Id*. at PgID1548) (emphasis

in original.)  The paperwork also stated that if the employee is represented by an attorney, the regulations require that all notices be served on the attorney, with a copy to the employee.  (*Id*.)  Plaintiff noted that there was a space on the ORM paperwork for her to indicate that she was represented and to give her attorney contact information but she did not fill this out or return any of the paperwork because she felt that the description of her complaint was wrong. (Kuriakose Dep. 138:2-21.) Plaintiff testified that she believed she had given "them" attorney Marko's contact information at some earlier point over the phone, but she did not return the paperwork that required her to supply her attorney contact information. (*Id*. at 138:5-15.)

Plaintiff testified that she read the paperwork and understood everything about the deadlines she must meet and that is why she was anxious to get the paperwork corrected.  (*Id*. at 139:1-16.)  However, because the material said nothing about the sexual harassment Plaintiff had suffered, Plaintiff did not want to just sign and return the paperwork so she attempted to contact Ward to say that the information she received was incorrect.  (*Id*. at 135:24-137:6.)  Plaintiff states that she tried to contact Ward several times to tell her the paperwork needed to be corrected.  Plaintiff testified that Ms. Ward kept telling her to correct the paperwork and return it, but Plaintiff insisted she was waiting for corrected paperwork to be returned to her.  (Kuriakose Dep. 140:2-141:10, 142:25-143:25, 145:12-16.) Plaintiff believes that between the

time she received the ORM paperwork on March 6, 2014, and March 18, 2014, when Ward finally emailed Plaintiff acknowledging Plaintiff's phone call that day and apologizing for being unable to connect, she had tried to contact Ward several times. (Def.'s Mot. Ex. 22, March 18, 2014 Email from Ward to Kuriakose). Ward's email, however, continued to direct Plaintiff to return the corrected paperwork, including the relevant notices. (*Id*.)

Lydia Ward, who works for ORM, explained that her job as an EEO counselor is to process informal EEO complaints from the time they are assigned to her until the end of the 30-day informal complaint process, at which time the matter is reassigned to someone else if the employee elects to proceed with a formal complaint. Her main role is to educate the employee on the process but also to resolve the matter short of a formal complaint if possible. (ECF No. 40, Pl.'s Resp. Ex. K, March 31, 2016 Deposition of Lydia Ward 8:21-9:22.) Ms. Ward testified that during this 30-day period, she is emailing and calling the employee to clarify the claim and to see if they need an extension or what is happening because the 30-day period is established by the EEOC. (*Id*. at 34:13-35:12.) The process continues and the 30-day clock continues to run, even if the employee does not contact her or she can't make contact with the employee. (*Id*. at 36:1-37:8.) Ms. Ward testified that her understanding of Plaintiff's complaint was derived from Plaintiff's intake sheet because Plaintiff did

not "embellish" or give her any further detailed information. (*Id*. at 42:3-8.) Ms. Ward testified that she continued to try to set up interviews with Plaintiff, that they would talk but never really completed an interview. Ward testified that Plaintiff spoke about her duty hours being changed and Plaintiff never said she was being sexually harassed, although Ward would ask why do you believe the duty hours issue is on the basis of sex and Plaintiff was "non-committal" about whether she was being sexually harassed. (*Id*. at 43:15-44:25, 50:7-53:12.) If the complainant notifies her that the information is incorrect, the complainant has to make the changes, initial it, and then send the letter back. Upon receiving a corrected claim, Ward goes into the system and changes the information. But the 30-day clock keeps ticking from the date of the original mailing, so that the corrections have to come from the employee – the EEO cannot reissue the paperwork because that would start the 30-day period all over. (*Id*. at 54:3-12, 56:4-57:15-67:19.)

Ward acknowledged that she received an email from Plaintiff on March 4, 2014, within the five days specified in Ward's March 4, 2014 mailing, stating that the information that Ward sent was not correct. According to Ward, Plaintiff was responsible for correcting the paperwork and returning the paperwork to Ward. (Ward Dep. 67:25-76:15.) Plaintiff admits that she never did return any part of the EEO paperwork that was sent to her on March 6, 2014, despite the fact that Plaintiff

had just retained Mr. Marko, an attorney at the Rasor Law Firm, which had been recommended by Plaintiff's family friend and attorney Harsha Gowda to represent Plaintiff in this employment situation. Mr. Marko actively represented Plaintiff during this entire 30-day period. (*Id*. at 80:14-81:17, 147:14-16.)

On March 31, 2014, Ward emailed Plaintiff and explained that April 1, 2014 would be day 30 of the informal process and that Ward was required by EEO guidelines to conclude the informal stage. The email required a response from Plaintiff indicating whether Plaintiff wished to go forward with the EEO process. (Kuriakose Dep. 147:19-148:3; Def.'s Mot. Ex. 24, Ward to Kuriakose Email 3/31/14.) Plaintiff responded in an email to Ward on April 2, 2014, that the matter of her change of work stations and tour of duty issues had not been pursued, indicating she no longer wanted to pursue her EEO claim on those issues. (Def.'s Mot. Ex. 25, Kuriakose to Ward Email 4/2/14.) Plaintiff further stated in the email to Ms. Ward that because Plaintiff was involved as a witness in the criminal proceedings against Bou-Assaly she was uncertain about what to do with the ORM paperwork and asking what needs to be done. Plaintiff states she was looking for Ward's input. (Kuriakose Dep. 148:8-150:2; Def.'s Mot. Ex. 25, 4/2/14 Email.) Ms. Ward responded and stated that it appeared that Plaintiff was not pursuing (and therefore was not harmed by) the change of work station and tour of duty and acknowledging that Plaintiff was a

witness in the criminal prosecution. (Def.'s Mot. Ex. 26, Ward to Kuriakose Email 4/2/14.) Plaintiff found this response outrageous because Ward knew the background of Plaintiff's assault allegations. But Plaintiff never informed Ward that her statements were outrageous, or attempted to correct Ward's "misimpression." Plaintiff did nothing further and did not correct and return the paperwork as instructed to preserve her right to continue with her complaint, again despite the fact that Plaintiff had retained experienced employment law counsel who was actively working on her case during this entire period, sending FOIA requests to the VA and Ann Arbor police in late March. (Kuriakose Dep. 150:3-153:2; (Def.'s Mot. Ex. 23, FOIA Request from Jonathan Marko; Def.'s Mot. Ex. 3, Interrog. Resp. No. 17, PgID1418.)

On April 3, 2014, Plaintiff received in the mail the "Notice of Right to File" paperwork, that had previously been emailed to her on March 31, 2014, regarding her right to continue her claim and to file a formal complaint .[2] The paperwork spelled out

---

[2] The Notice provided in pertinent part:

I have enclosed two copies of the *Notice of Right to File a Discrimination Complaint (including VA Form 4939)*. At this point you have three options available to you. To help you make your decision, I have also enclosed a copy of EEOC's Guidelines for what it takes to prove discrimination. Please read these documents carefully and make your decision based on the options below:

 **Option 1:** You can choose to file a formal complaint of discrimination on some or all of the issues. If you wish to file a formal complaint, please sign and date the *Notice of Right to File a Discrimination Complaint* and VA Form 4939; retain one copy for your records, and return a copy to one of the

three very specific options for continuing on to the formal complaint stage. The

paperwork clearly stated in bold on the first page that if the Plaintiff desired to file a

formal complaint, she had 15 calendar days from receipt of the letter (so until April

18, 2014) to file the form so indicating. (Def.'s Mot. Ex. 27, April 1, 2014 Letter to

Kuriakose from Ward.) The Notice clearly that stated that a failure to complete the

Form and return it would indicate Plaintiff's wish not to further pursue the allegations

discussed with her counselor. The paperwork also had a place for Plaintiff to write

in any claim that she *did* wish to pursue and required the paperwork to be returned

within 15 days. (Def.'s Mot. Ex. 27; Kuriakose Dep. 153:7-157:14.) The paperwork

clearly stated that a failure to take further action would indicate that Plaintiff did not

---

addresses listed on the *Notice of Right to File Discrimination Complaint.*

**If you decide to file a formal complaint, you have 15 calendar days from
receipt of this notice in which to do so.** Please do not mail the VA Form
4939 to me; your formal complaint must be mailed to one of the addressees
listed on the first page of the enclosed Notice of Right to File Discrimination
Complaint.

**Option 2:** If after reviewing the EEOC guidelines for what it takes to prove
discrimination, you no longer wish to pursue your claims, you can end the
process by signing and dating the enclosed withdrawal form, which will
indicate your desire not to pursue the claims you discussed with the counselor
any further. . . .

**Option 3:** If you take no further action, it will also indicate your wish not to
pursue the allegations discussed with the counselor any further. (Emphasis in
original.)

desire to pursue the matter further.  (Def.'s Mot. Ex. 27, at 2, PgID 1569.)

On April 4, 2014 Plaintiff emailed Ward and said I received your paperwork, i.e. the Notice of Right to File.  Plaintiff explained in the email that the basis of her complaint was retaliation following a complaint of sexual indecency and assault, referring to the February 21, 2014 changed tour-of-duty change allegations, and not discrimination as mentioned in the paperwork she received.  (Def.'s Mot. Ex. 28, Kuriakose to Ward Email 4/4/14.)  Plaintiff reiterated in the email that she did not intend to pursue her tour-of-duty charges because she had not been moved nor had her hours been changed.  (Def.'s Mot. Ex. 28, PgID 1583.)  Plaintiff did not ask for a clarification of the Notice of Right to File paperwork but explained that no tour-of-duty changes occurred and she would let Ms. Ward know if the matter was to be pursued again.  Plaintiff thought that her email to Ward would be sufficient to convey that she was confused and that Ward would get back to her to clarify the process. Plaintiff agreed that "it was a mix up between her and Ward." (*Id*. at 157:15-161:10.) Plaintiff also assumed that the paperwork had been sent to her attorney or that Ward would be contacting her attorney, even though Plaintiff had not filled out the paperwork indicating that she was represented by an attorney.  (*Id*. at 164:7-166:4.)

Plaintiff admits that when she received the Notice of Right to File paperwork on April 3, 2014, that contained express dates for certain action on Plaintiff's part, she

was actively represented by her attorney, Mr. Marko.   (*Id*. at 161:12-21.)

Significantly, Plaintiff admits that she informed her attorney on April 5, 2014, that she

had received the Notice to File paperwork:

> Interrogatory No. 20: After you received the VA's Notice of Right to File on April 3, 2014, please list the date on which you notified your attorney that you had received the Notice of Right to File or sought advice from your attorney about the Notice of Right to File.
>
> Answer: April 5, 2014.

(Def.'s Mot. Ex. 29, Pl.'s Supp. Interrog. Resp. No. 20, at 2, PgID 1585.)

In fact, on March 21, 2014, prior to Plaintiff's receipt of her Notice of Right to

File paperwork, as discussed *supra*, Plaintiff's attorney Mr. Marko had sent an FOIA

request to the VA police seeking information about the incident involving Plaintiff

that occurred on or about December 6, 2013.  (Def.'s Mot. Ex. 23, FOIA Request from

Jonathan Marko.)  On that same day, Plaintiff's attorney sent a FOIA Request to the

Ann Arbor Police Department.   (Def.'s Mot. Ex. 3, Interrog. Resp. No. 17,

PgID1418.)  Thus, at the time that Plaintiff received her Notice of Right To File

paperwork, her attorney was fully engaged in her representation.  Plaintiff admits that

she informed Mr. Marko that she had received her Notice of Right to File Paperwork

on April 5, 2014, two days after she received the paperwork.  Both Plaintiff and her

attorney had notice that the 15-day time period for filing a formal complaint had

begun to run.

Other than the April 4, 2014 email to Ward, neither Plaintiff nor her attorney did anything further between April 3, 2014, and the deadline of April 18, 2014, fifteen days later, for filing her formal complaint. Plaintiff was just "hoping" that Ward would talk to Plaintiff's attorney. (*Id*. at 166:12-168:12.) Plaintiff admits that she never returned *any* paperwork she received because she thought it was incorrect. (*Id*. at 169:18-20.) VA records confirm that Plaintiff never filed a formal complaint. (Def.'s Mot. Ex. 30, Sept. 23, 2014 Declaration of Tami Press ¶ 7.)

## II.    STANDARD OF REVIEW

Summary judgment is appropriate where the moving party demonstrates that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56(a). A fact is "material" for purposes of a summary judgment motion where proof of that fact "would have [the] effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties." *Midwest Media Prop., L.L.C. v. Symmes Twp., Ohio*, 503 F.3d 456, 469 (6th Cir. 2007) (quoting *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984)). A dispute over a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

"Rule 56(e) identifies affidavits, depositions, and answers to interrogatories as appropriate items that may be used to support or oppose summary judgment." *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009). "Of course, [the moving party] always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Taft Broadcasting Co. v. United States*, 929 F.2d 240, 247 (6th Cir. 1991) (internal quotation marks omitted) (quoting *Celotex*, 477 U.S. at 323). If this burden is met by the moving party, the non-moving party's failure to make a showing that is "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," will mandate the entry of summary judgment. *Celotex*, 477 U.S. at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323.

"The test is whether the party bearing the burden of proof has presented a jury question as to each element in the case. The plaintiff must present more than a mere scintilla of the evidence. To support his or her position, he or she must present evidence on which the trier of fact could find for the plaintiff." *Davis v. McCourt*, 226

F.3d 506, 511 (6th Cir. 2000) (internal citations and quotation marks omitted). The non-moving party may not rest upon the mere allegations or denials of his pleadings, but the response, by affidavits or as otherwise provided in Rule 56, must set forth specific facts which demonstrate that there is a genuine issue for trial. Fed. R. Civ. P. 56(e). "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586–587 (1986) (footnote and internal quotation marks omitted).

In making the determination on summary judgment whether there are genuine issues of material fact for trial, the court must draw all reasonable inferences in favor of the non-moving party. *See Moran v. Al Basit LLC*, 788 F.3d 201, 204 (6th Cir. 2015). "'The central issue is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Binay v. Bettendorf*, 601 F.3d 640, 646 (6th Cir. 2010) (quoting *In re Calumet Farm, Inc.*, 398 F.3d 555, 558 (6th Cir. 2005)). At the same time, plaintiff must produce enough evidence to allow a reasonable jury to find in his favor by a preponderance of the evidence, *Anderson*, 477 U.S. at 252, and "[t]he 'mere

possibility' of a factual dispute is not enough." *Martin v. Toledo Cardiology Consultants, Inc.*, 548 F.3d 405, 410 (6th Cir. 2008) (quoting *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992)). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50 (internal citations omitted).

Ultimately, the party who bears the burden of proof must present a jury question as to each element of the claim. *See Davis*, 226 F.3d at 511. Plaintiff cannot meet that burden by relying solely on "[c]onclusory assertions, supported only by [his or her] own opinions." *Arendale v. City of Memphis*, 519 F.3d 587, 560 (6th Cir. 2008). Plaintiff must show probative evidence, based "on more than mere speculation, conjecture, or fantasy," to prevail. *Id.* at 601 (quoting *Lewis v. Philip Morris Inc.*, 355 F.3d 515, 533 (6th Cir.2004)).

All evidence submitted in opposition to a motion for summary judgment must ultimately be capable of being presented in a form that would be admissible at trial:

> The submissions by a party opposing a motion for summary judgment need not themselves be in a form that is admissible at trial. Otherwise, affidavits themselves, albeit made on personal knowledge of the affiant, may not suffice, since they are out-of-court statements and might not be admissible at trial. *See* Fed.R.Evid. 801(c), 802. However, the party opposing summary judgment must show that she can make good on the promise of the pleadings by laying out enough evidence that will be admissible at trial to demonstrate that a genuine issue on a material fact

exists, and that a trial is necessary. Such "'evidence submitted in opposition to a motion for summary judgment must be admissible.'" *Alpert v. United States*, 481 F.3d 404, 409 (6th Cir. 2007) (quoting *United States Structures, Inc. v. J.P. Structures, Inc.*, 130 F.3d 1185, 1189 (6th Cir.1997)). That is why "'[h]earsay evidence . . . must be disregarded.'" *Ibid*. It is also the basis of this court's repeated emphasis that unauthenticated documents do not meet the requirements of Rule 56(e).

*CareSource*, 576 F.3d at 558-59 (internal citations omitted).

## III.  ANALYSIS

Title VII "provides the exclusive judicial remedy for claims of discrimination in federal employment." *Brown v. General Servs. Admin.*, 425 U.S. 820, 834 (1976). "The right to bring an action under Title VII regarding equal employment [opportunity] in the federal government is predicated upon the timely exhaustion of remedies, as set forth in [the EEOC regulations]." *Hunter v. Sec'y of the United States Army*, 565 F.3d 986, 993 (6th Cir. 2009) (internal quotation marks and citation omitted) (alterations in original).  This exhaustion requirement applies to all claims of discrimination in the federal workplace, including "retaliation claims based on conduct that preceded" an EEO charge. *Taylor v. Donahoe*, 452 F. App'x 614, 617 (6th Cir. 2011) (citing *Abeita v. TransAmerica Mailings, Inc.*, 159 F.3d 246, 254 (6th Cir. 1998)).  "'In permitting federal employees to sue under Title VII, Congress conditioned the government's waiver of sovereign immunity upon a plaintiff's

satisfaction of 'rigorous administrative exhaustion requirements and time limitations.'" *Steiner v. Henderson*, 354 F.3d 432, 434-35 (6th Cir. 2003) (quoting *McFarland v. Henderson*, 307 F.3d 402, 406 (6th Cir. 2002)). Despite the rigorous exhaustion requirements imposed under Title VII, these requirements "are subject to waiver, estoppel, and equitable tolling." *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 393 (1982).

Under the EEOC regulations, an employee seeking to assert a claim under Title VII must timely complete a two-step exhaustion process. First, "[a]n aggrieved person must initiate contact with a Counselor within 45 days of the date of the matter alleged to be discriminatory." 29 C.F.R. § 1614.105(a)(1). Second, "[i]f the matter has not been resolved [after counseling], the aggrieved person shall be informed in writing by the Counselor . . . of the right to file a discrimination complaint within 15 days of receipt of the notice," 29 C.F.R. § 1614.105(d). "[An EEO discrimination] complaint must be filed [with the agency] within 15 days of receipt of the notice required by § 1614.105(d) . . . ." 29 C.F.R. § 1614.106(b). It is well established that a Title VII claim against a governmental agency cannot be maintained unless the administrative steps outlined in these EEOC regulations have been exhausted. *See, e.g., Brown*, 425 U.S. at 832 (noting that an aggrieved federal employee must meet administrative preconditions before filing a claim of employment discrimination);

*Hunter*, 565 F.3d at 993 ("'The right to bring an action under Title VII regarding equal employment [opportunity] in the federal government is predicated upon the timely exhaustion of administrative remedies, as set forth in [the EEOC regulations].'") (quoting *Benford v. Frank*, 943 F.2d 609, 612 (6th Cir. 1991) and citing *Brown*, 425 U.S. at 829–32) (alterations in original).

As Plaintiff's counsel conceded at the summary judgment hearing, both the 45-day and the 15-day deadlines must be timely met for Plaintiff to maintain her Title VII claim. It is undisputed that Plaintiff retained Mr. Marko as her employment counsel in this matter on March 4, 2014, and that Mr. Marko was actively involved in her case throughout the months of March and April. It is undisputed that both Plaintiff and her attorney received notice of Plaintiff's right to file a formal discrimination complaint on April 3 and 5, 2014, respectively, and were very clearly apprised, by the Right to File paperwork, of the 15-day deadline for filing such a formal complaint or forfeiting the right to pursue Plaintiff's claims. It is also undisputed that Plaintiff failed to file a formal complaint within the 15-day period following receipt of her Notice of Right to File paperwork and to this day has never filed a formal complaint of discrimination with the EEOC.

Plaintiff does not dispute that she was required, but failed, to administratively exhaust her claims by filing a formal complaint of discrimination within 15 days of

having received her Notice of Right to File on April 3, 2014. It is undisputed that Plaintiff never filed, and to this day still has not filed, a formal complaint. Notwithstanding these undisputed facts, Plaintiff claims that she is entitled to "equitable tolling" of the 15-day period. The Court disagrees.

Addressing a threshold matter, Defendant asserts that Plaintiff wrongly characterizes her claim regarding the 15-day period as one for equitable tolling, when in fact the claim relies on principles of estoppel. (Def.'s Reply 2) ("[P]laintiff's argument regarding the 15-day deadline, which focuses entirely on the allegedly contradictory verbal statements from two VA employees, addresses the elements of estoppel, not tolling."). Although Plaintiff's arguments regarding the 15-day deadline may more properly be characterized as seeking to estop the Defendant from asserting the defense of administrative exhaustion, the Sixth Circuit has also considered such evidence as bearing on the reasonableness of plaintiff's ignorance of the time constraint under the tolling analysis. *See, e.g., Steiner*, 354 F.3d at 436 (observing that "evidence of affirmative representations by the employer that misled a Title VII complainant into missing a filing deadline are sufficient to toll the applicable Title VII period "). The Court will consider Plaintiff's claims regarding the 15-day period under both estoppel and tolling principles.

The Sixth Circuit has held that a claim of equitable estoppel against the

33

government requires a greater degree of misconduct than will sustain a typical estoppel-based claim:

> "Estoppel is an equitable doctrine which a court may invoke to avoid injustice in particular cases." *Fisher v. Peters*, 249 F.3d 433, 444 (6th Cir. 2001). "[T]he traditional elements of equitable estoppel are: (1) misrepresentation by the party against whom estoppel is asserted; (2) reasonable reliance on the misrepresentation by the party asserting estoppel; and (3) detriment to the party asserting estoppel." *LaBonte v. United States*, 233 F.3d 1049, 1053 (7th Cir. 2000). The government, however, "may not be estopped on the same terms as any other litigant." *Heckler v. Cmty. Health Servs. of Crawford Cty., Inc.*, 467 U.S. 51, 60, 104 S.Ct. 2218, 81 L.Ed.2d 42 (1984). Instead, "[a] party attempting to estop the government bears a very heavy burden" in sustaining its argument. *Fisher*, 249 F.3d at 444. At a minimum, the party must demonstrate some "affirmative misconduct" by the government in addition to the other estoppel elements. *Ibid*.

> Our Court has never announced the definition of "affirmative misconduct." Although we have cases applying the rule, *see, e.g., In re Gardner*, 360 F.3d 551, 559 (6th Cir. 2004), we have not set the bounds of the concept. A review of our sister circuits, however, reflects a general consensus on the definition.

> The Ninth Circuit defines "affirmative misconduct" as a deliberate lie or a pattern of false promises. *Socop-Gonzalez v. I.N.S.*, 272 F.3d 1176, 1184 (9th Cir.2001) (en banc). In an earlier case it gave a more developed definition, explaining that "[n]either the failure to inform an individual of his or her legal rights nor the negligent provision of misinformation constitute affirmative misconduct." *Sulit v. Schiltgen*, 213 F.3d 449, 454 (9th Cir. 2000). The Seventh Circuit defines "affirmative misconduct" as "more than mere negligence. . . . It requires an affirmative act to misrepresent or mislead." *LaBonte*, 233 F.3d at 1053. The Fifth Circuit, in almost identical language, defines "affirmative misconduct" as "something more than merely negligent conduct." *United States v. Marine Shale Processors*, 81 F.3d 1329, 1350

34

n. 12 (5th Cir. 1996). Instead, "the [government] official must intentionally or recklessly mislead the estoppel claimant." *Id.* at 1350. Lastly, the Fourth Circuit defines "affirmative misconduct" as lying rather than misleading and as malicious, not negligent, conduct. *Keener v. E. Associated Coal Corp.*, 954 F.2d 209, 214 n. 6 (4th Cir.1992).

Finding the common approach of sister circuits prudential, we hold that "affirmative misconduct" is more than mere negligence. It is an act by the government that either intentionally or recklessly misleads the claimant. The party asserting estoppel against the government bears the burden of proving an intentional act by an agent of the government and the agent's requisite intent.

*Michigan Express, Inc. v. United States*, 374 F.3d 424, 427 (6th Cir. 2004).

Equitable tolling applies to the administrative time requirements set forth in the EEOC regulations only in a very narrow set of circumstances. *Irwin v. Dep't of Veteran Affairs*, 498 U.S. 89, 95-96 (1990) (recognizing that equitable tolling may apply "in situations where the claimant has actively pursued his judicial remedies by filing a defective pleading during the statutory period, or where the complainant has been induced or tricked by his adversary's misconduct into allowing the filing dealing to pass"). *See also Steiner*, 354 F.3d at 435 (noting that "the forty-five day filing period is not a jurisdictional prerequisite, and can be tolled where principles of equity demand it"). "'At the same time, the Supreme Court has made clear that tolling in a Title VII context should be allowed 'only sparingly.'" *Steiner*, 354 F.3d at 435 (quoting *Irwin*, 498 U.S. at 95). The Sixth Circuit similarly has noted that equitable

tolling in the Title VII context is "'available only in compelling cases which justify a departure from established procedures.'" 354 F.3d at 435 (quoting *Puckett v. Tennessee Eastman Co.*, 889 F.2d 1481, 1488 (6th Cir. 1989)).

The decision whether to allow equitable tolling is fact specific and considers several factors. These factors are not exhaustive and none is controlling:

> In considering whether equitable tolling should apply, we generally look at five factors: (1) whether the plaintiff had actual notice of the time restraint; (2) whether she had constructive notice of the time restraint; (3) the degree of diligence exerted in pursuing her rights; (4) the degree of prejudice to the defendant; and (5) the reasonableness of plaintiff's ignorance of the time constraint.

*Steiner*, 354 F.3d at 435 (citing *EEOC v. Ky. State Police Dep't*, 80 F.3d 1086, 1094 (6th Cir. 1996); *Andrews v. Orr*, 851 F.2d 146, 151 (6th Cir. 1988)). Evidence that an employer's affirmative misrepresentations misled or "tricked" the plaintiff into missing a deadline can bear on the reasonableness of the plaintiff's ignorance of the time constraint. *Steiner*, 354 F.3d at 436.

Plaintiff argues that she was misled by Ms. Ward into believing that she acted appropriately in failing to return the Right to File paperwork within the applicable 15-day period. To succeed on either her estoppel or her equitable tolling claim relative to this 15-day exhaustion period, Plaintiff must establish that Ms. Ward engaged in affirmative acts of misconduct that misled Plaintiff regarding the very deadlines that

36

were clearly stated in the Right to File paperwork that Plaintiff admits she received, read, and understood to be time sensitive. According to Plaintiff, when she informed Ms. Ward in an April 4, 2014 email that her claim was one for retaliation, not discrimination, and was incorrectly described, Ms. Ward did nothing to clarify Plaintiff's claim. However, in Plaintiff's own words, this "was a mix up between her and Ward." (Kuriakose Dep. 161:6-8.) Furthermore, there is no dispute that Plaintiff received and reviewed the Right to File paperwork, which set forth the deadlines for filing a formal complaint, and explained the consequences of taking no action. Plaintiff testified that she was aware of, and was nervous about meeting, those deadlines. Yet Plaintiff took no affirmative action to perfect her claim and rested on "the hope" that Ward was talking to Plaintiff's attorney.

Plaintiff has produced insufficient evidence to support a finding that Ms. Ward's conduct satisfies the "intentional and reckless" standard for a claim of estoppel or the "intentional misleading/trickery" standard for equitable tolling. Even if Plaintiff was confused by what she characterizes as a "mix up" with Ms. Ward, there was nothing misleading about the deadlines in the Right to File paperwork that Plaintiff admits she received and reviewed.

But even if the Court were to conclude (which it does not) that there is sufficient evidence to support a finding that Ms. Ward's conduct intentionally or

recklessly misled the Plaintiff about the 15-day deadline, the same cannot be said as to Plaintiff's attorney, who received notice of the Right to File deadline on April 5, 2014, and also failed to take action. Plaintiff concedes in her brief that the limitations period for filing her formal complaint would begin to run when her attorney Mr. Marko received notice of the 15-day deadline. (ECF No. 40, Pl.'s Resp. 24, PgID 1620.) Plaintiff admitted in her answers to interrogatories that she informed her attorney that she had received her Notice of Right to File paperwork on April 5, 2014, two days after Plaintiff received the Notice, and well within the time frame for complying with the 15-day deadline by completing and returning the Right to File paperwork. It is undisputed that Plaintiff was actively represented during this exhaustion period by experienced employment law counsel and that Plaintiff promptly notified her counsel of receipt of her Notice of Right to File paperwork on April 5, 2014, the day after she received it. *Steiner*, 354 F.3d at 436 ("'Constructive knowledge of a time limit will usually be imputed when the plaintiff retains an attorney within the limitations period.'") (quoting *Weigel v. Baptist Hosp.*, 302 F.3d 367, 376 (6th Cir. 2002)).

Because Plaintiff admits receipt of the Notice of Right to File paperwork and because Plaintiff's attorney, who was actively involved in representing the Plaintiff at the time that Plaintiff received her Notice of Right to File, also received timely

notice of Plaintiff's receipt of her Right to File paperwork, Plaintiff failure to exhaust her administrative remedies by failing to file a formal EEO complaint within 15 days of receipt of her Right to File Notice is inexcusable. This failure to timely exhaust her claims is dispositive of her Title VII claim.

## IV. CONCLUSION

Plaintiff failed to exhaust her remedies as necessary to pursue her Title VII claim. She did not timely file a Formal EEO Complaint within 15 days of receiving her Notice of Right to File, even though she was actively represented by employment counsel whom she timely advised of her receipt of her Notice to File paperwork.

Accordingly, the Court GRANTS Defendant's Motion for Summary Judgment.[3]

IT IS SO ORDERED.

s/Paul D. Borman
Paul D. Borman
United States District Judge

Dated: October 17, 2017

---

[3] Because the Court finds that Plaintiff's failure to meet the 15-day deadline for filing her formal complaint is dispositive of her claims, the Court need not reach Defendant's alternative argument regarding Plaintiff's separate failure to meet the 45-day deadline for reporting her claim of discrimination. Because Plaintiff does not rely on any claim of mental incapacity with respect to the 15-day exhaustion period, the Court need not address the admissibility of Dr. Shiener's opinion. Therefore, the Court DENIES AS MOOT Defendant's motion to exclude Dr. Shiener's testimony. (ECF No. 30.)

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on October 17, 2017.

s/Deborah Tofil
Case Manager